1 | RICHARD K. DIAMOND (State Bar No. 070634)
rdiamond@dgdk.com
2 | STEVEN J. SCHWARTZ (State Bar No. 200586)
sschwartz@dgdk.com
3 | DANNING, GILL, DIAMOND & KOLLITZ, LLP
2029 Century Park East, Third Floor
4 | Los Angeles, California 90067
Telephone: (310) 277-0077
5 | Facsimile: (310) 277-5735

6 | Proposed Attorneys for David A. Gill, Chapter 7 Trustee

7 | **UNITED STATES BANKRUPTCY COURT**

8 | **CENTRAL DISTRICT OF CALIFORNIA**

9 | **LOS ANGELES DIVISION**

10 | In re ) Case No. 2:11-bk-30486-RN
)
11 | INTERNATIONAL ARCHITECTURAL ) Chapter 7
GROUP, LLC, )
12 | )
Debtor. ) NOTICE OF EMERGENCY MOTION AND
13 | ) EMERGENCY MOTION FOR ORDER: (1)
) AUTHORIZING USE OF CASH COLLATERAL
14 | ) PURSUANT TO BUDGET; (2)
) AUTHORIZING CHAPTER 7 TRUSTEE TO
15 | ) OBTAIN POST-PETITION FINANCING,
) (3) PROVIDING ADEQUATE PROTECTION
16 | ) IN THE FORM OF REPLACEMENT LIENS
) AND SUPERPRIORITY STATUS, (4)
17 | ) SCHEDULING A FINAL HEARING; (5)
) APPROVING PROCEDURES FOR HANDLING
18 | ) RECLAMATION CLAIMS; (6)
) AUTHORIZING PAYMENT TO JOINT
19 | ) PAYEES OF CHECKS; (7), AUTHORIZING
) EMPLOYMENT OF FORMER CRO AND OTHER
20 | ) KEY EMPLOYEES; (8) APPROVING
) EMPLOYMENT OF KENNETH B. ROELKE AS
21 | ) FIELD AGENT; (9) AUTHORITY TO USE
) PRE-PETITION CREDIT CARD MERCHANT
22 | ) ACCOUNTS; (10) APPROVING
) MARKETING/ LIQUIDATION AGENT; AND
23 | ) (11) SUCH OTHER RELIEF AS
) APPROPRIATE; MEMORANDUM OF POINTS
24 | ) AND AUTHORITIES
)
25 | ) [Declaration of David A. Gill
) Filed Concurrently Herewith]
26 | ) Date: May 26, 2011
) Time: 10:30 a.m.
27 | ) Place: Courtroom "1645"
) 255 E. Temple St.
28 | Los Angeles, CA 90012

1

369911.01 [XP] 1130496A

# TABLE OF CONTENTS

Page

MEMORANDUM OF POINTS AND AUTHORITIES .......................... 7

I.   JURISDICTION ............................................. 7

II.  BACKGROUND FACTS ........................................ 7

     A.   The Bankruptcy Cases ............................... 7

     B.   Nature of the Debtors' Businesses .................. 8

     C.   Bankruptcy History ................................. 9

     D.   Secured Debt ...................................... 10

     E.   Post-Delaware Chapter 11, Pre-Chapter 7 Events ...... 11

     F.   Debtors' Assets and Liabilities ..................... 13

     G.   Immediate Activities taken by Trustee .............. 14

     H.   Liquidation Efforts ............................... 15

III. RELIEF REQUESTED ....................................... 16

     A.   Proposed Use of Cash Collateral/Post-Petition
          Financing ......................................... 16

     B.   Retention of Former Employees/CRO .................. 19

     C.   Disbursement of Joint Checks ....................... 21

     D.   Procedures for Reclamation Demands ................. 21

     E.   Employment of Kenneth B. Roelke as Field
          Agent. ............................................ 22

     F.   Authority to Continue Use of Credit Card
          Merchant Accounts. ................................ 23

IV.  ARGUMENT ............................................... 24

     A.   The Trustee Has an Immediate Need for Use of
          Cash Collateral and Postpetition Financing. ........ 24

     B.   The Lenders Are Adequately Protected For the
          Debtors' Use of Cash Collateral. ................... 26

     C.   The Preservation and Enhancement of the
          Collateral Resulting from the Trustee's
          Actions Affords Further Adequate Protection to
          the Lenders. ...................................... 29

-i-

1                    **TABLE OF CONTENTS (cont.)**

2                                                                        <u>Page</u>

3        D.    Post-Petition Financing Secured by Replacement
               Liens and Superpriority Administrative Expense
4              Claims is Appropriate. ............................ 30

5    VI.   DISCLOSURES MADE PURSUANT TO FEDERAL RULE OF
           BANKRUPTCY PROCEDURE 4001(c)(1)(B) AND LOCAL
6          BANKRUPTCY RULE 4001-2 ................................. 32

7    VII.  REQUEST FOR FINAL HEARING ON THE WITHIN MOTION .......... 34

8    VIII. THE TRUSTEE SHOULD BE AUTHORIZED TO PAY
           POSTPETITION WAGES EARNED BY EMPLOYEES NECESSARY TO
9          THE PRESERVATION AND LIQUIDATION OF THE DEBTORS'
           ASSETS .................................................. 35
10
     IX.   THE TRUSTEE SHOULD BE AUTHORIZED TO EMPLOY ROELKE
11         AS HIS FIELD REPRESENTATIVE ............................. 39

12   X.    THE TRUSTEE'S PROPOSED RECLAMATION PROCEDURES
           SHOULD BE APPROVED ...................................... 37
13
     XI.   CONCLUSION .............................................. 38
14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

369911.01 [XP] 1130496A

1

## TABLE OF AUTHORITIES

2
                                                                        Page(s)

3  **Cases**

4  Federal National Mortgage v. Dacon Bollingsbrook
        Associates Limited Partnership, 153 B.R. 204,
5       (N.D.Ill. 1993) ................................. 28

6  Freightliner Market Development v. Silver Wheel Freight,
        823 F.2d 362, (9th Cir. 1987) ..................... 24
7

   In re Adams Apple, 829 F.2d 1484 (9th Cir. 1987) ............. 35
8

   In re Affiliated of Florida, Inc. 237 B.R. 495
9       (Bankr. M.D.Fla.,1998) ................................. 37

10 In re Belco, Inc., 38 B.R. 525 Bankr. W.D.Okla. 1984) ......... 26

11 In re CoServ, LLC, 273 B.R. 487 (Bankr. N.D. Tex. 2002) ....... 35

12 In re Feit & Drexler, Inc., 760 F.2d 406 (2nd Cir. 1985) ...... 35

13 In re George Ruggiere Chrysler Plymouth, Inc., 727 F.2d
        1017 (11th Cir. 1984) ................................. 26
14

   In re Ionosphere Clubs, Inc., 98 B.R. 174
15      (Bankr. S.D.N.Y. 1989) ................................. 36

16 In re McCombs Properties VI, Ltd., 88 B.R. 261, Bankr.
        C.D.Cal. 1988), citing In re Martin, 761 F.2d 472
17      (8th Cir. 1985) ................................... 27,28

18 In re Elliott Lease Cars, Inc., 20 B.R. 893 (Bankr.
        D.R.I. 1982) ................................. 27
19

   In re Mocco, 176 B. R. 355 (Bankr. D.N.J. 1995), citing
20      United Savings Association v. Timbers of Inwood
        Forest Associates, 484 U.S. 365, 108 S. Ct. 626, 98
21      L.Ed.2d 740 (1988) ................................. 27

22 In re Oak Glen R-Vee, 8 B.R. 213 (Bankr. C.D.Cal. 1981) ....... 28

23 In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982) ........... 27, 28

24 In re Triplett, 87 B.R. 25 (Bankr. W.D.Tex. 1988) ............. 28

25

26

27

28

369911.01  [XP] 1130496A

**TABLE OF AUTHORITIES (cont.)**

Page(s)

Statutes

11 U.S.C. § 105(a) ........................................... 29,35

11 U.S.C. § 327 ............................................. 38

11 U.S.C. § 361 ........................................... 26,27,31

11 U.S.C. § 361(2) ........................................... 29

11 U.S.C. § 362 ............................................. 26

11 U.S.C. § 363 ........................................... 23,24,26

11 U.S.C. § 363(b) ........................................... 35

11 U.S.C. § 363(c)(2) ........................................ 24

11 U.S.C. § 363(b)(1) ...................................... 23,35

11 U.S.C. § 363(e) ........................................... 26

11 U.S.C. § 363(p)(1) ........................................ 26

11 U.S.C. § 363(p)(2) ........................................ 26

11 U.S.C. § 364 ........................................... 24,26,30

11 U.S.C. § 364(c) ........................................... 24

11 U.S.C. § 364(d) ........................................ 25,31

11 U.S.C. § 503(b) ........................................... 23

11 U.S.C. § 503(b)(1) ..................................... 24,27,30

11 U.S.C. § 503(c) ........................................... 23

11 U.S.C. § 506(c) ........................................... 29

11 U.S.C. § 542 ............................................. 29

11 U.S.C. § 543 ............................................. 29

11 U.S.C. § 544 ............................................. 29

11 U.S.C. § 545 ............................................. 29

11 U.S.C. § 546 ............................................. 29

11 U.S.C. § 546(c) ........................................ 37,54

369911.01 [XP] 1130496A

### TABLE OF AUTHORITIES (cont.)

Page(s)

11 U.S.C. § 547 .......................................... 29

11 U.S.C. § 548 .......................................... 29

11 U.S.C. § 549 .......................................... 29

11 U.S.C. § 550 .......................................... 29

11 U.S.C. § 551 .......................................... 29

11 U.S.C. § 552 .......................................... 29

11 U.S.C. § 552(b) ....................................... 24

11 U.S.C. § 553 .......................................... 29

11 U.S.C. § 1107(a) ....................................... 7

11 U.S.C. § 1108 .......................................... 7

**Rules**

Local Bankruptcy Rule 2016-2(f)  ..................... 3,37,38

Local Bankruptcy Rule 2016-2(g)  ....................... 2,7

Local Bankruptcy Rule 2081-1 ............................ 27

Local Bankruptcy Rule 4001-2 .......................... 2,7,32

Local Bankruptcy Rule 4001-2(c)  ......................... 2

Local Bankruptcy Rule 4001(b)  ......................... 18

Local Bankruptcy Rule 4001(b)(2) ....................... 34

Local Bankruptcy Rule 4001(c)(2) ....................... 34

Local Bankruptcy Rule 9075-1(a)  ....................... 2,7

Local Bankruptcy Rule 9075-1(a)(4)  ...................... 6

Fed.R.Bankr.P. 4001 ...................................... 7

Fed.R.Bankr.P. 9014 ...................................... 7

369911.01 [XP] 1130496A

## TABLE OF AUTHORITIES (cont.)

**Treatises**

3 Collier on Bankruptcy, ¶361.03, p. 361-9 (Alan N.
   Resnick and Henry J. Sommer eds., 15th ed. rev.
   2011) ................................................ 27

2 Collier on Bankruptcy ¶ 105.02 at 105-4 (15th ed. Rev.
   2011) ................................................ 35

369911.01 [XP] 1130496A

1  TO THE HONORABLE RICHARD M. NEITER, UNITED STATES BANKRUPTCY

2  JUDGE, THE TWENTY-FIVE LARGEST UNSECURED CREDITORS OF THE DEBTORS,

3  SECURED CREDITORS, PARTIES REQUESTING SPECIAL NOTICE AND THE

4  OFFICE OF THE UNITED STATES TRUSTEE:

5       PLEASE TAKE NOTICE that on May 26, 2011 at 10:30 a.m., in the

6  above-referenced Bankruptcy Court (the "Court"), David A. Gill,

7  Chapter 7 Trustee (the "Trustee") of the bankruptcy estates of

8  International Architectural Group, LLC, Case No. 2:11-bk-30486-RN

9  ("IAG"), United States Aluminum of Canada Limited, Case No. 2:11-

10  bk-30507-RN ("USAC"), International Architectural Products, Inc.,

11  Case No. 2:11-bk-30496-RN ("UAP"), and International Management

12  Services Group, Inc., Case No. 2:11-bk-30504-RN ("IMSG")

13  (collectively, the "Debtors") will and hereby does move the Court

14  on an emergency basis pursuant to 11 U.S.C. §§ 105, 361, 363, 364,

15  1107(a) and 1108, Fed.R.Bankr.P. 4001 and 9014, and Local

16  Bankruptcy Rules 2016-2(g), 2081-1, 4001-2, and 9075-1(a) for

17  entry of interim and final orders authorizing the Trustee to use

18  cash collateral, to obtain post-petition financing and granting

19  related relief (the "Motion").  By the Motion, the Trustee seeks

20  an order (1) approving the use of cash collateral and post-

21  petition financing on an emergency interim basis, within the

22  limits of the proposed interim budget that is attached as Exhibit

23  "A" to the Declaration of David A. Gill, as Trustee (the

24  "Trustee's Declaration"), of up to $1,112,797, plus actual

25  reasonable and necessary professional fees as may be hereinafter

26  fixed and determined, of the Trustee, his counsel, accountants and

27  financial advisors employed pursuant to 11 U.S.C. § 327, to be

28  paid as a carve out, through the first 30 days of the Case,

2

1  pending a final hearing, and as necessary to enable the Trustee to
2  preserve estate assets and avoid immediate and irreparable harm
3  (the "Interim Budget") and authorizing the Trustee to pay said
4  expenses without the need for further orders pursuant to Local
5  Bankruptcy Rule 2016-2(f) or otherwise; (2) confirming the
6  previous advance by the Lenders of $250,000 which was subject to
7  Lender approval of specific disbursements, and authorizing further
8  advances if the Lenders so wish, for payment of items within the
9  Interim Budget ("Post-Petition Financing"); (3) granting adequate
10 protection to the Lenders on an interim basis in the form of
11 replacement liens against the Debtors' (other than USAC) post-
12 petition cash, property and accounts receivable, with such
13 replacement liens to have the same force, effect, validity and
14 priority as the Lenders' liens as of the date of the filing of the
15 petitions, and superpriority administrative expense claim status;
16 and (4) scheduling and establishing deadlines regarding a final
17 hearing on the Trustee's use of cash collateral and Post-Petition
18 Financing.

19      In addition to the foregoing, the Trustee requests the
20 following relief on a final basis without the requirement of a
21 another hearing: (5) Approving certain procedures for handling
22 reclamation claims; (6) Authorizing payment to joint payees of
23 checks; (7), Authorizing the retention and employment of certain
24 key employees, including Neil Minihane, the former CRO of the
25 Debtors and Mike Norring, accounting manager and a
26 Marketing/Liquidation Manager if a proposed contract and
27 supplemental justification is timely submitted; (8) Authorizing
28 employment of Kenneth B. Roelke as Field Agent; (9) Authorizing

3

1  the Trustee to use pre-petition credit card merchant accounts;

2  (10) Authorizing retention of the proposed Marketing/ Liquidation

3  Agent if sufficient support can be provided in time for

4  consideration by the court; and (10) Granting such other and

5  further relief that may be just and proper.

6      The form of the Order which the Trustee requests be entered

7  by the Court is attached as Exhibit "1" hereto.

8      This Emergency Motion is made on the grounds that:

9  (1) the proposed use of the cash collateral and Post-Petition

10 Financing is necessary for the preservation and liquidation of the

11 business assets which are in 26 locations throughout the United

12 States and Canada and is in the best interests of the estate and

13 the creditors; and (2) preservation and liquidation of the assets

14 as contemplated by the Trustee will maximize the values of the

15 assets for the benefit of creditors of the estates.

16     This Motion is based upon this Notice of Emergency Motion and

17 Emergency Motion, the accompanying Memorandum of Points and

18 Authorities, the Trustee's Declaration filed concurrently

19 herewith, the papers and pleadings on file in this case, and such

20 other evidence that may be presented to the Court.

21     **PLEASE TAKE FURTHER NOTICE** that a summary of the essential

22 terms of the Trustee's proposed cash collateral and Post-Petition

23

24 Financing use (pursuant to Local Bankruptcy Rule 4001-2(c)) are as

25 follows:

26      • The Motion does not request approval of any of the items

27        cited in Local Bankruptcy Rule 4001-2(b).

28

4

1   of accounts receivable, and funds advanced by the

2   Lenders, pursuant to the Budget appended to the

3   Trustee's Declaration as Exhibit "A" on an interim basis

4   from May 11, 2011 through June 10, 2011, and thereafter

5   on a final basis.

6   • The Motion proposes to grant IAL Acquisitions Co., A

7       California corporation; Canadian Imperial Bank of

8       Commerce, New York Agency, as Administrative Agent; and

9       the lenders from time to time a party thereto

10      (collectively, the "Lenders") a replacement lien on

11      their existing collateral and the proceeds thereof,

12      excluding avoidance causes of action, as adequate

13      protection if and only to the extent that their

14      prepetition security interests are valid, enforceable,

15      properly perfected and non-avoidable.

16  **PLEASE TAKE FURTHER NOTICE** that as required by the Local

17 Bankruptcy Rules, the Trustee has served notice of the Motion and

18 the Motion itself on the following parties or counsel for parties

19 in interest on May 20, 2011: the United States Trustee, the twenty

20 five largest unsecured creditors (as best as could be ascertained

21 by the Trustee).  Since this is a Chapter 7 case, no 1007(d)

22 Statement of 20 Largest Creditors was required to be filed and no

23 schedules have yet been filed) and any secured creditor whose

24 collateral includes cash collateral or whose lien(s) might be

25 affected by the relief sought; as required by Local Bankruptcy

26 Rule 9075-1(a)(4) and by Order of this Court, service was made by

27 facsimile, personal service or other electronic means provided,

28 however, that Express or overnight mail was used where the Debtor

1 │ was unable to notify by facsimile, personal service or other

2 │ electronic means.

3 │ **PLEASE TAKE FURTHER NOTICE** that any interested party who

4 │ wishes to file an opposition to the Motion must do so in writing,

5 │ and must file it with the Court and serve a copy on the

6 │ undersigned counsel at the address provided in the upper left-hand

7 │ corner of the first page of this notice, on the Office of the

8 │ United States Trustee, 725 S. Figueroa St., 26th Floor, Los

9 │ Angeles, CA 90017, and counsel for the Lenders, Samuel Khalil,

10 │ Milbank, Tweed, Hadley & McCloy LLP, 1 Chase Manhattan Plaza, New

11 │ York, NY 10005, so that it is received by May 25, 2011.  If you do

12 │ not oppose any of the relief sought in the Motion, no action need

13 │ be taken.

14 │

15 │ Dated: May 20, 2011      DANNING, GILL, DIAMOND & KOLLITZ, LLP

16 │

17 │

│                        By:    /s/ Steven J. Schwartz
18 │                              STEVEN J. SCHWARTZ
│                              Attorneys for David A. Gill,
19 │                              Chapter 7 Trustee

20 │

21 │

22 │

23 │

24 │

25 │

26 │

27 │

28 │

6

1           <u>**MEMORANDUM OF POINTS AND AUTHORITIES**</u>

2           **I.**

3           <u>**JURISDICTION**</u>

4     This court has jurisdiction over this Motion pursuant to 28

5 U.S.C. §§ 157 and 1334.  This proceeding is a core proceeding

6 under 28 U.S.C. § 157(b)(2).  Venue is proper under 28 U.S.C.

7 §§ 1408 and 1409.

8     The statutory predicates for the relief requested herein are

9 11 U.S.C. §§ 105, 361, 363, 364, 1107(a) and 1108, Fed.R.Bankr.P.

10 4001 and 9014, and Local Bankruptcy Rules 2016-2(g), 2081-1, 4001-

11 2, and 9075-1(a).

12           **II.**

13           <u>**BACKGROUND FACTS**</u>

14 **A.    The Bankruptcy Cases**

15     1.    The bankruptcy cases of <u>International Architectural</u>

16 <u>Group, LLC</u>, Case No. 2:11-bk-30486-RN ("IAG"), <u>United States</u>

17 <u>Aluminum of Canada Limited</u>, Case No. 2:11-bk-30507-RN ("USAC"),

18 <u>International Architectural Products, Inc.</u>, Case No. 2:11-bk-

19 30496-RN ("UAP"), and <u>International Management Services Group,</u>

20 <u>Inc.</u>, Case No. 2:11-bk-30504-RN ("IMSG") (the "Cases") were

21 commenced on May 11, 2011 (the "filing date"), when four

22 affiliated companies (the "Debtors") filed voluntary Chapter 7

23 petitions in the United States Bankruptcy Court for the Central

24 District of California.

25     2.    On the filing date, David A. Gill (the "Trustee") was

26 appointed as the Interim Trustee of the Cases.  The Cases were

27 filed on an emergency basis and, as of this time, no bankruptcy

28 schedules or statements of financial affairs have been filed.

B.   **Nature of the Debtors' Businesses**

3.   The Debtors owned and operated an integrated building products manufacturing business consisting of diversified lines of aluminum and vinyl building products.  The operations spanned the United States and operations and assets were also located in Canada.

4.   Operations were principally conducted by two of the Debtors, USAC and IAP, through a series of divisions which were divided into three primary business groups:  Residential Products, Commercial Products and Aluminum Extrusion operations.[1]  The operations of all Debtors apparently crossed corporate lines.

5.   The Residential Products Group operated as International Window Corporation, International Window-Northern California and International Window Corporation Arizona, Inc.  It manufactured and distributed vinyl and aluminum windows and doors for residential housing markets.  It operated in two California locations, in Southgate and Hayward, and a third facility in Phoenix, Arizona, which was closed pre-petition.

6.   The Commercial Products Group includes eight divisions, as follows:

a.   Two of the Commercial Products Group divisions, United States Aluminum of Canada Limited- Langley and United States Aluminum of Canada Limited- Guelph were divisions of USAC, the Canadian entity.  USAC is reported to have free and clear cash, which the Trustee is trying to access.  These divisions

---

[1] An organization chart is attached to the Trustee's Declaration, marked as Exhibit "B" and incorporated herein by this reference.

8

1  manufactured and distributed architectural aluminum to the

2  commercial construction industry.

3       b.    The "United States Aluminum" American Divisions

4  (the "USA Divisions") consisted of United States Aluminum

5  Corporation-California, United States Aluminum Corporation-

6  Illinois, United States Aluminum Corporation-Texas, United States

7  Aluminum Corporation-Central Warehouse, and United States Aluminum

8  Corporation-Carolina.   The USAC and USA Divisions operated at 12

9  locations total in 11 states and in Langley, Ontario, Canada.   Of

10 those locations, five were distribution sites, and seven were

11 manufacturing sites.   USAC and IAP sublease these premises from

12 IMSG, and have one or more subleases.

13      c.    RACO Interior Products, Inc. produced interior

14 aluminum door frames and window systems for commercial office

15 applications.   It operated in three Texas locations, Waxahachie,

16 Houston and Dallas.   The property in Waxahachie is owned by IAP.

17      7.    The Extrusion Products Group consists of one division,

18 International Extrusion Corporation-Texas ("IEC"), which produced

19 extruded aluminum parts for the other business units and outside

20 third parties (revenue was 50% internal and 50% external).   It is

21 located on the IAP-owned facility in Waxahachie, Texas at 202

22 Singleton Drive.

23 C.   **Bankruptcy History**

24      8.    On April 30, 2010, the United States Bankruptcy Court

25 for the District of Delaware entered an order confirming the Joint

26 Plan of Reorganization under Chapter 11 of the Bankruptcy Code,

27 dated January 3, 2010 of International Aluminum Corporation

28 ("IAC") and its affiliated debtors, Jointly Administered Case No.

9

1   10-10003 (MFW) (the "Plan"). Pursuant to the Plan, IAC, its

2   holding company and various subsidiaries were dissolved, merged,

3   and/or replaced by IAG as the holding company of subsidiaries IAP,

4   ISMG, and USAC.

5       9.   Most of the domestic assets are now owned by IAP, while

6   most of the Canadian assets are owned by USAC.  ISMG is a

7   management company that also owns farmland and IT assets

8   associated with its function.  IAG is the parent entity and has no

9   assets except its equity interest in the other debtors.

10      10.  The stated purpose of the pre-pack Chapter 11

11  reorganization was to "effectuate a restructuring of the Debtors'

12  capital structure in order to bring it into alignment with the

13  Debtors' present and future operating prospects."  In other words,

14  the goal was to reduce the amount of the Debtors' outstanding

15  indebtedness by converting the obligations under its credit

16  agreement into a combination of new equity, new term notes and a

17  payment of excess cash to the senior lenders.

18      11.  USAC, whose assets are stated to be not subject to the

19  liens of the Lenders, was not among the debtors in the Delaware

20  Case and was not restructured thereby, other than to obtain a new

21  parent company, IAG.

22  D.  **Secured Debt**

23      12.  According to the Plan, prior to filing of the chapter

24  11, IAC (with the Domestic Subsidiaries other than USAC as

25  guarantors) obtained a term loan from its senior lenders whose

26  administrative agent was Canadian Imperial Bank of Commerce, New

27  York Agency ("CIBC") (the "Lenders") in the aggregate principal

28  amount of approximately $98.8 million plus revolving credit lines

1  in the aggregate outstanding principal amount of $20 million (the

2  "Senior Secured Debt").

3       13.   In addition, IAC (with the Domestic Subsidiaries other

4  than USAC as guarantors) executed a certain Senior Subordinated

5  Loan Agreement with Carlyle Mezzanine Partners, L.P. as agent for

6  the lenders ("CMP") in the aggregate outstanding principal amount

7  of approximately $48.1 million plus accrued interest (the

8  "Mezzanine Debt").

9       14.   Among the restructuring effects of that Plan, various

10  intermediate financiers were taken out, including the Mezzanine

11  Debt, which was extinguished, and the Senior Secured Debt was

12  restructured by payment of cash on hand in excess of $20 million

13  net of certain expenses and tax refunds, a new 5 year term loan in

14  the aggregate principal amount of $38 million (the "Restructured

15  Secured Debt") and 100% of the common equity of IAC and/or its

16  reorganized entity.   The Lenders claim to hold all assets of all

17  companies except USAC as collateral.

18  **E.    Post-Delaware Chapter 11, Pre-Chapter 7 Events**

19       15.   While the confirmed Plan restructured the Debtors'

20  balance sheet, it did not attempt to restructure the operations.

21  The businesses operated pre-chapter 11 and through the chapter 11

22  process and post chapter 11 by a management team lead by CEO

23  Richard Almy and CFO Jeffery Park.   On November 9, 2010, the

24  Debtors retained Neil J. Minihane of Turn Works LLC as Chief

25  Restructuring Officer (the "CRO") to address the alarmingly high

26  cash burn rate post-confirmation.

27       16.   By late December, 2010, after a series of expense and

28  cost cutting initiatives put in place by the CRO, it became

11

1  apparent that the Debtors were not meeting the projections upon
2  which the Plan was premised and that the Debtors needed to be
3  restructured again.  The Debtors were attempting to bring together
4  the Senior Lenders and the major landlord, Alum Landlord (DE) QRS
5  16-105, Inc , an entity owned or controlled by WP Carey, which
6  owns and leases to Debtors nine of the Debtors' largest facilities
7  by reason of a 2007, 20-year sale lease back arrangement, to
8  discuss a consensual out-of-court restructuring.  The CRO's
9  efforts were closely monitored by Lenders, through the Agent Bank,
10 Canadian Imperial Bank of Commerce- New York ("CIBC").  The
11 Lenders are represented by Milbank Tweed Hadley McCloy LLP
12 ("Milbank").

13      17.  On May 5, 2011, the Lenders swept all bank accounts
14 except that of United States Aluminum of Canada ("USAC") (which
15 entity is believed and apparently conceded to be not indebted
16 thereto) receiving more than $10 million.  Then a week later, CIBC
17 swept those accounts again receiving in excess of $3 million,
18 bringing their debt down to approximately $25 million and leaving
19 the Debtors other than USAC with no immediate access to capital.
20 Final payrolls were permitted by the Lenders and paid through a
21 payroll service.  Debtors' counsel, the CRO and an accounting
22 employee were paid a retainer to prepare schedules.  The doors
23 were locked, all employees terminated, and arrangements were made
24 for nominal security precautions at the many locations, in terms
25 of former employees checking periodically and some drive-by
26 observation.  The Chapter 7 Petitions were filed thereafter on May
27 11, 2011.

28

**F.    Debtors' Assets and Liabilities**

18.   In order to obtain an understanding of the general description of assets and values, the Trustee has reviewed appraisals conducted in March, 2011, and interviewed counsel for the Debtors and the CRO, and based thereon believe that the asset situation is approximately as set forth below.  In that connection, the Trustee is advised and believes that it may still be possible to sell portions of the business as going concerns if sales occur within the next few weeks.  The Trustee has not attempted to estimate market prices.  It is, however, also important to note that inventory, especially of metals, has substantial intrinsic value even as scrap.

19.   Alhambra Property.  This property consists of the fee simple interest in IAP's 7.85 acre site located at 875 S. Fremont Avenue and 1000-1100 S. Meridian Avenue, Alhambra, California 91803 (the "Alhambra Property").  This was a former extrusion plant.  Its contents were previously sold.  It consists of several buildings, the largest of which was 185,000 square feet, in a redevelopment area.  There are no mortgages on this property except that it is reported to be encumbered by the liens of the Lenders.  There is an offer to purchase this property for $7,300,000 cash, which will require environmental and legal work to consummate if approved.

20.   Waxahachie Campus.  This property, at three different addresses on Singleton Drive, Waxahachie, Texas (the "Waxahachie Campus"), houses the major extrusion plant, which, it is believed, could be sold as a going concern.  Thereon are located three different buildings, at which four of the operating groups were

13

1  housed.  This property is reported to be encumbered by the liens

2  of the Lenders.  The estimated value is unknown.  Certain

3  assumptions made during the chapter 11 case valued it at

4  $1,230,000.  The Trustee has received numerous inquiries from

5  people who state their interest in purchasing assets at the

6  Waxahachie Campus as part of a going concern sale with other

7  assets.  There could be considerable environmental risks

8  associated with the extrusion business at this location, and

9  special care needs to be taken as to certain machinery and

10  equipment.

11      21.  Waxahachie Farmland.  This is believed to be vested in

12  IMSG, and is rented to a tenant farmer.  The value carried on the

13  books is approximately $590,000.  The Trustee is unclear as to

14  security status.

15      22.  Attached to the Trustee's Declaration as Exhibit "C" is

16  a Chart reflecting the Trustee's current and best understanding of

17  the assets and liabilities of each corporation.

18  G.   **Immediate Activities taken by Trustee**

19      23.  Upon his appointment, the Trustee was informed that

20  customer payments were typically made by checks delivered to the

21  various business premises and that customer checks were therefore

22  likely at several of the locations, locked up in the premises with

23  other assets.  The Trustee was not given an estimate of the total

24  of such checks, and was concerned that they might become non-

25  negotiable unless he could access them immediately.  The Trustee

26  gave appropriate notices, made demands on all banks, and met with

27  counsel for the Lenders.  The Trustee asked the CRO to assist with

28  maintaining the status quo.

14

24.    The Trustee was advised that most of the locations, including the many leaseholds, had property of value on the premises including machinery, equipment and inventory, and that it was necessary to maintain the status quo both to seek in-place sales of the personal property and, in some cases, the real prospect of quick going concern sales that might yield a greater price than a piecemeal liquidation.  Also, certain locations had machinery and equipment that had to be maintained at the premises as shutting them down would create further expense to comply with environmental requirements.

25.    The Trustee immediately arranged with the CRO to retain certain employees in the areas of each facility to obtain checks and forward mail, to interface with various security firms, which the Trustee has asked to provide security at different locations, especially some which the Trustee felt were inadequately protected because of outside storage of materials.  Compensation was to be provided for by the subordination and advances described herein, and pursuant to the Interim Budget.

**H.    Liquidation Efforts**

26.    The Trustee is advised that the Lenders have selected Hilco Industrial, which specializes in industrial auctions for used machinery, as the Marketer/Liquidator for the assets.  The Trustee has not yet received or had opportunity to review said proposal.  The Trustee will review it and will supplement the herein Motion with a request for additional relief, or file a new motion, as appropriate.

27.    In addition to the above-mentioned efforts, the Trustee has most recently reviewed a letter from IAP's pre-petition real

15

1 │ estate broker, wherein IAP purports to accept the terms of an

2 │ offer, with certain exceptions, for the purchase of certain real

3 │ estate of IAP including a lot and vacant building at 100 S.

4 │ Meridian Ave., Alhambra, California (the "Alhambra Property")

5 │ including the total purchase price of $7,300,000.  The Trustee is

6 │ in the process of reviewing said offer, and if acceptable, will

7 │ shortly file a motion seeking approval thereof.  The Trustee is

8 │ informed that the Alhambra Property was not operating for over six

9 │ months pre-petition and that it is not essential for any going

10 │ concern sale.

11 │                              III.

12 │                        **RELIEF REQUESTED**

13 │ A.    **Proposed Use of Cash Collateral/Post-Petition Financing**

14 │        Subject to this Court's approval, the Trustee requests

15 │ permission to use cash collateral of up to $1,112,797, plus any

16 │ cash generated from collections on accounts receivable, and any

17 │ moneys that the Lenders may see fit to advance.  Pending receipt

18 │ of such cash, the Lenders deposited $250,000 with the Trustee, in

19 │ trust ("Post-Petition Financing"), and authorized the use of

20 │ $100,000 thereof to arrange for security and the collection of

21 │ accounts receivable.

22 │        The Trustee seeks the entry of an order in the form of the

23 │ proposed order that is attached hereto as Exhibit "1," authorizing

24 │ the Trustee to use cash collateral, as that term is defined in

25 │ section 363(a) of the Bankruptcy Code, of the Lenders, and to

26 │ obtain Post-Petition Financing on an interim basis through June

27 │ 10, 2011.

28 │

                                16

1   The Lenders hold an interest in the cash collateral in that
2   it possesses a blanket lien securing claims of at least $25
3   Million affecting most of the Debtors' real and personal property,
4   other than the property of the Canadian affiliate, USAC.   Such
5   cash collateral includes without limitation, cash and accounts
6   receivable as of the filing date.

7   The Trustee seeks to use the cash collateral to pay
8   maintenance and liquidation expenses through and including June
9   10, 2011 within the limits of the proposed budget that is attached
10  as Exhibit "A" to the Trustee's Declaration, pending a final
11  hearing to be set by the Court on not less than 15 days' notice.
12  These operating expenses include without limitation: (1) wages,
13  salaries, and reimbursements of expenses of employees and
14  consultants necessary for the preservation of assets; (2) lease
15  payments; (3) payment of utilities and utility deposits; (4)
16  installation of security measures (e.g., changing locks, employing
17  security companies) among other necessary items as set forth in
18  detail therein.   The proposed use of the cash collateral is
19  necessary for the preservation of assets while the Trustee pursues
20  timely sales of the Debtors' assets for the benefit of the estates
21  and their creditors.

22  The Trustee seeks to use Cash Collateral and Post-Petition
23  Financing and to grant to the Lenders, as adequate protection of
24  their interests in the Cash Collateral, a replacement security
25  interest in and lien upon the existing collateral and any proceeds
26  thereof, as set forth below.

27  The Lenders and the Trustee are currently negotiating the
28  terms of a final cash collateral/financing budget which will cover

1    the cost and expense necessary to substantially complete removal

2    and liquidation of assets at the properties.   The Lenders are also

3    negotiating the terms of an agreement with Hilco, or such other

4    Marketer/Liquidator as may be agreed upon by the Trustee and the

5    Lenders, for the orderly liquidation of the Debtors' assets, the

6    terms of which will be incorporated into any final budget.

7         The Trustee, with the assistance of the CRO, the Accounting

8    Manager, and Crowe Horwath, LLP, the Trustee's proposed

9    accountants and financial advisors ("Crowe"), has prepared a

10   projected cash flow budget reflecting anticipated revenue and

11   expenditures through the first four weeks of the case, contained

12   in the proposed Interim Budget attached to the Trustee's

13   Declaration as Exhibit "A."   The Interim Budget includes line

14   items for fees of the Trustee and his professionals as well as

15   some other longer term expenses, but does not include amounts

16   thereon.   It is anticipated that estimates of the amounts for such

17   line items will be incorporated into the final budget, if

18   possible.   It is believed that the Interim Budget sets forth the

19   minimum amount of cash necessary for the Trustee to cover the

20   estates' emergency preservation needs.

21        As set forth in the Interim Budget, the Trustee seeks

22   authority to use cash on hand and which may be advanced by Lenders

23   and funds generated from the collection of accounts receivable and

24   other readily available sources.   Such cash and receipts allegedly

25   constitute the Lenders' "cash collateral" within the meaning of

26   section 363(a) of the Bankruptcy Code.

27        The Trustee requests that the Court conduct an interim

28   hearing, pursuant to Bankruptcy Rule 4001(b):  (1) approving the

                                  18

369911.01 [XP] 1130496A

1  use of Cash Collateral and Post-Petition Financing on an emergency

2  interim basis, pending a final hearing, in accordance with the

3  Interim Budget, to enable the Trustee to preserve assets of the

4  estate and avoid immediate and irreparable harm to the estates,

5  (2) granting adequate protection to the Lenders on an interim

6  basis, and (3) scheduling and establishing deadlines regarding a

7  final hearing on the Trustee's use of Cash Collateral and Post-

8  Petition Financing.

9  **B.    Retention of Former Employees/CRO**

10        The Trustee needs to retain the services of former employees,

11  including the CRO, and the Accounting Manager, as well as two

12  clerical employees on an hourly basis to close the books and

13  process accounts receivable and support tax related matters and

14  this has been authorized by the Lenders.   None will be paid more

15  than the hourly equivalent of their normal wages.   The amounts

16  that the Trustee anticipates paying the former employees over the

17  Interim Period are as set forth in the Interim Budget.   The

18  services of said employees are necessary in order to ensure that

19  there is at least one "contact person" at or around each location

20  that can conduct ordinary functions such as collect mail

21  (including accounts receivable payments), coordinate necessary

22  repairs, maintenance and security issues as they arise, and

23  otherwise "keep an eye on" the properties.   A list thereof, which

24  is illustrative due to volatility of employee assistance, is

25  attached to the Trustee's Declaration marked as Exhibit "D" and

26  incorporated herein by this reference.

27        In addition to use of former employees for limited purposes,

28  the Trustee requires the services and institutional knowledge of

369911.01 [XP] 1130496A

1  the CRO in order to secure and preserve the assets and to
2  coordinate the liquidation efforts.   In addition, the Debtors'
3  counsel has advised that they do not intend to prepare bankruptcy
4  schedules or statements of financial affairs, preferring that the
5  Trustee take on that task and have delivered the remaining balance
6  of their retainer to the Trustee.   Since schedules have to be
7  filed, the Trustee will take on that task, but requires the
8  Accounting Manager, and the CRO to be retained to assist with the
9  preparation thereof, as he would otherwise be required to expend
10 significantly greater amounts to learn the details of the Debtors'
11 pre-petition financial affairs and the details of its accounting
12 data and would be required to employ personnel to complete
13 accounting work using an accounting system which they would not be
14 conversant.

15     The CRO's billable rate is $500 per hour.   His resume is
16 attached to the Trustee's Declaration, marked as Exhibit "E" and
17 incorporated herein by this reference.   The Trustee proposes to
18 compensate the CRO from cash collateral and Post-Petition
19 Financing upon the terms as set forth in the retention letter
20 attached to the Trustee's Declaration, marked as Exhibit "F" and
21 incorporated herein by this reference.   In sum, the CRO will be
22 paid an advance retainer of $15,000 upon entry of the Order
23 approving said retention, and pay 75% of the estimated weekly
24 payments (or $15,000/week), on an interim basis, at the beginning
25 of each week thereafter.   The Trustee anticipates compensating the
26 CRO a total of $86,000 over the 30 day period as reflected on the
27 Interim Budget.

28

369911.01  [XP] 1130496A

1    In addition, the Trustee requires the services of Mr. Mike
2  Norring, who has for many years been the supervising in-house
3  accountant, who knows the business and customers, locations of
4  assets, status of accounts receivable, including joint pay
5  arrangements, and especially working with the accountants and the
6  IRS relative to claimed tax refunds and ongoing audits.   The
7  Trustee anticipates employing Mr. Norring for at least several
8  months on a full-time basis.   The Trustee proposes to pay him $76
9  per hour and $900 per month for health insurance.   Mr. Norring's
10  compensation over the 30 day interim period is included within the
11  Interim Budget.

12  **C.   Disbursement of Joint Checks**

13    The Trustee is receiving some checks which were originally
14  issued jointly to one of the Debtors and a contractor or other
15  third party, and endorsed by the other party for deposit, based on
16  the understanding that the endorser is delivering the checks in
17  trust and is entitled to payment of a certain amount, which the
18  bookkeeping department ascertains.   The Trustee requests that he
19  be permitted to receive, deposit and/or and disburse such payments
20  to third parties without further order, subject to normal
21  reporting requirements.

22  **D.   Procedures for Reclamation Demands**

23    The Trustee has received several reclamation demands in
24  connection with goods allegedly delivered to the Debtors pre-
25  petition.   The Lenders have indicated that they oppose any action
26  taken by the Trustee that would allow sellers to reclaim goods
27  delivered to the Debtors pre-petition.   A true and correct copy of
28  a letter the Trustee received from the Lenders on this issue is

21

1  attached to the Trustee's Declaration, marked as Exhibit "G" and
2  incorporated herein by this reference.  As part of this Motion,
3  the Trustee requests authority to permit claimants to take
4  possession of their claimed merchandise if, and only if, the
5  Lenders or their designated agent agree (or fails to object within
6  an agreed period) or, if they do not agree, that the Court permit
7  the Lenders, the claimant or the Trustee to initiate contested
8  proceedings on notice to the Lenders and the claimant.  Nothing
9  herein is intended to affect any claim for money made by such
10  claimants.

11  **E.    Employment of Kenneth B. Roelke as Field Agent.**

12        28.   The Trustee has determined that it is necessary to
13  retain Kenneth B. Roelke & Associates, Inc. ("Roelke") as his
14  field representative to assist the Trustee in preserving,
15  maintaining, and liquidating the assets of the estates which
16  includes, without limitation, the following tasks:   (a) to take
17  possession of and secure the business premises and the books and
18  records of the Debtor;  (b) to investigate, locate and inspect
19  tangible assets; (c) to assist the Trustee's collections
20  representative in identifying and collecting the Debtor's accounts
21  receivable, and for any future discoveries; (d) to assist the
22  Trustee's CPA or forensic accountant; (e) to assist the Trustee's
23  computer forensics and technology consultant in preserving and/or
24  recovering valuable computer data reflecting the Debtors' pre-
25  petition business operations; (f) to assist in the surrender of
26  assets to third parties that have a secured interest or
27  reclamation demand for which the Lenders consent or a Court order
28  is obtained; and (g) to take such other actions, and engage in

1 such other activities, that benefit the estate and that are

2 reasonably necessary to and associated with the Debtors, including

3 without limitation the relevant actions that are more fully

4 described in Roelke's resume, a copy of which is attached as

5 Exhibit "H" to the Trustee's Declaration.   Roelke's billable rate

6 is $150 per hour, which is significantly less than that of the

7 other professionals in this case, which makes his employment

8 advantageous for handling matters that do not require the services

9 of the Trustee, the CFO or the Trustee's lawyers and accountants.

10 **F.    Authority to Continue Use of Credit Card Merchant Accounts.**

11    29.   Although the Trustee is not presently in the process of

12 selling any assets by accepting credit cards, it is necessary to

13 maintain such existing accounts in order to allow all prior

14 transactions to clear and to reconcile "chargebacks" and recover

15 any reserves established in connection with such accounts.   In

16 addition, it may become necessary or desirable to use such

17 accounts in connection with any future retail liquidation of parts

18 or inventory should such liquidation be recommended by the

19 Trustee's liquidation agent and the process of establishing such

20 an account by a Chapter 7 Trustee could be lengthy and difficult

21 to achieve.

22

23

24

25

26

27

28

1                                    IV.

2                               ARGUMENT

3   A.    **The Trustee Has an Immediate Need for Use of Cash Collateral**

4         **and Postpetition Financing**.

5          Section 363 governs the use, sale or lease of property,

6   including cash collateral.[2]  Section 363(b)(1) provides in

7   relevant part that the trustee, after notice and a hearing, may

8   use, sell or lease property of the estate other than in the

9   ordinary course of business.  Section 363(c)(2) provides that the

10  trustee may not use, sell or lease cash collateral under section

11  363(c)(1) unless: (1) each entity that has an interest in such

12  cash collateral consents; or (2) the court, after notice and a

13  hearing, authorizes such use, sale, or lease in accordance with

14  the provisions of section 363. See Freightliner Market

15  Development v. Silver Wheel Freight, 823 F.2d 362, 367-68 (9th

16  Cir. 1987).

17         Section 364 of the Code provides that if the trustee is

18  unable to obtain unsecured credit allowable under § 503(b)(1) of

19  the Code as an administrative expense,

20              the court, after notice and a hearing, may
                authorize the obtaining of credit or the
21              incurring of debt –

22

23         [2] "Cash collateral" is defined in 11 U.S.C. § 363(b)(1) as
24  cash, negotiable instruments, documents of title, securities,
    deposit accounts or other cash equivalents in which the estate and
25  an entity other than the estate have an interest, and includes the
    proceeds, products, offsprings or profits of property subject to a
26  security interest as provided in 11 U.S.C. § 552(b), whether
    existing before or after the commencement of the case.
27

28
                                    24

1
2
3
4

> (1) with priority over any or all
> administrative expenses of the kind specified
> in section 503(b) or 507(b) of this title;
> (2) secured by a lien on property of the
> estate that is not otherwise subject to a
> lien; or
> (3) secured by a junior lien on property of
> the estate that is subject to a lien.

5

6  11 U.S.C. § 364(c).  Section 364 further provides:

7
8
9
10
11
12

> The court, after notice and a hearing, may
> authorize the obtaining of credit or the
> incurring of debt secured by a senior or equal
> lien on property of the estate that is subject
> to a lien only if -
> (A) the trustee is unable to obtain such
> credit otherwise; and
> (B) there is adequate protection of the
> interest of the holder of the lien on the
> property of the estate on which such senior or
> equal lien is proposed to be granted.

13

14  11 U.S.C. § 364(d).

15   The Trustee has an immediate need for the use of Cash

16  Collateral and Post-Petition Financing in order to preserve the

17  estates' assts.  The Trustee's expected use of Cash Collateral and

18  Post-Petition Financing during the interim period is reflected in

19  the Interim Budget.  All payments described in the Interim Budget

20  are necessary to maintain the Debtors' assets and preserve its

21  value for the benefit of the Debtors' creditors.  Specifically,

22  the Trustee must have access to Cash Collateral and Post-Petition

23  Financing to make payments to employees whom are necessary in

24  order to perform necessary functions at each of the facilities,

25  including mail collection and arranging for security and other

26  protections, payment of insurance, rent, maintain the Debtors'

27  computer systems which include vital information concerning

28  accounts receivable, pay for utilities and utility deposits to

369911.01 [XP] 1130496A

1   keep the electricity, trash disposal and other functions necessary

2   to keep the locations secure and operative for the length of time

3   it will take to liquidate the assets contained therein, among

4   other necessary functions as set forth in detail in the Interim

5   Budget.   Failure to make payments in accordance with the Interim

6   Budget could result in irreparable harm, including but not limited

7   to, loss of security for the buildings and environmental damage

8   caused by shut down of the extrusion equipment.

9   **B.      The Lenders Are Adequately Protected For the Debtors' Use of**

10  **        Cash Collateral.**

11          Under 11 U.S.C. § 363(e), a court may condition the use of

12  property, including cash collateral, as necessary to provide

13  adequate protection of an entity's interest in such cash

14  collateral.   Adequate protection is related to the risk of

15  "decrease in the value of [the secured creditor's] interest in

16  such property." See 11 U.S.C. § 361.   The general inquiry

17  regarding the use of cash collateral is whether the secured

18  creditor's interest in the cash collateral is adequately protected

19  against a decrease in the value of such collateral. In re George

20  Ruggiere Chrysler Plymouth, Inc., 727 F.2d 1017, 1019 (11th Cir.

21  1984).   Adequate protection, by its nature, must be determined on

22  a case by case basis. In re Belco, Inc., 38 B.R. 525, 527 (Bankr.

23  W.D.Okla. 1984).

24          The Trustee admittedly has the burden of proof on the issue

25  of adequate protection. 11 U.S.C. § 363(p)(1).   The secured

26  creditor has the burden of proof on the issue of the validity,

27  priority or extent of its interest in the collateral.   11 U.S.C. §

28  363(p)(2).

26

1     Section 361 of the Bankruptcy Code provides that when
2   adequate protection is required under section 362, 363, or 364 of
3   an interest of an entity in property, such adequate protection may
4   be provided by—

5     (1) requiring the trustee to make a cash payment or periodic
6   cash payments to such entity, to the extent that the stay under
7   section 362, use, sale, or lease under section 363, or any grant
8   of a lien under section 364 results in a decrease in the value of
9   such entity's interest in such property;

10    (2) providing to such entity an additional or replacement
11  lien to the extent that such stay, use, sale, lease, or grant
12  results in a decrease in the value of such entity's interest in
13  such property; or

14    (3) granting such other relief, other than entitling such
15  entity to compensation allowable under section 503(b)(1) as an
16  administrative expense, as will result in the realization by such
17  entity of the indubitable equivalent of such entity's interest in
18  such property.

19    Section 361 provides three non-exclusive means of providing
20  adequate protection, where the same is required, in that adequate
21  protection may take many forms. 3 Collier on Bankruptcy, ¶361.03,
22  p. 361-9 (Alan N. Resnick and Henry J. Sommer eds., 15th ed. rev.
23  2011).   The term "indubitable equivalent" has been interpreted
24  liberally.   In re Mocco, 176 B. R. 355 (Bankr. D.N.J. 1995),
25  citing United Savings Association v. Timbers of Inwood Forest
26  Associates, 484 U.S. 365, 378, 108 S. Ct. 626, 98 L.Ed.2d 740
27  (1988).   The use of cash collateral involves balancing the
28  interests of the debtor and the secured creditor and the equities

369911.01 [XP] 1130496A

1  in each case.  In re Stein, 19 B.R. 458 (Bankr. E.D.Pa. 1982).

2  Adequate protection is not intended nor need it stand as an

3  absolute guarantee to the secured creditor that it will receive

4  the value of its interest in the collateral; the cash collateral.

5  In re McCombs Properties VI, Ltd., 88 B.R. 261, 267 (Bankr.

6  C.D.Cal. 1988), citing In re Martin, 761 F.2d 472 (8th Cir. 1985);

7  In re Elliott Lease Cars, Inc., 20 B.R. 893 (Bankr. D.R.I. 1982).

8      It is well-established that the use of cash collateral to

9  preserve the value of a secured creditor's lien is in and of

10  itself sufficient to provide adequate protection to a secured

11  creditor for the use of such cash collateral.  Federal National

12  Mortgage v. Dacon Bollingsbrook Associates Limited Partnership,

13  153 B.R. 204, 214 (N.D.Ill. 1993); In re Triplett, 87 B.R. 25

14  (Bankr. W.D.Tex. 1988); In re Stein, 19 B.R. 458 (Bankr. E.D.Pa.

15  1982);  In re Oak Glen R-Vee, 8 B.R. 213, 216 (Bankr. C.D.Cal.

16  1981).  In Stein, the Court found that as a general rule, a debtor

17  may use cash collateral where such use would enhance or preserve

18  the value of the collateral, and allowed the Chapter 11 debtor to

19  use cash collateral notwithstanding the lack of an equity cushion.

20  The Court determined that the use of cash collateral was necessary

21  for the debtor's continued business operations and that the

22  creditor's secured position could only be enhanced by the

23  continued business operations.  Similarly, in McCombs, the Court

24  determined that the debtor's use of cash collateral for repairs,

25  renovations, and operating expenses eliminated the risk of

26  diminution in the creditor's interest in the cash collateral and

27  that such use would more likely increase cash collateral.  The

28  ordinary and customary costs of maintenance, operation and

28

1 preservation of property are expenses that preserve and enhance
2 the value of the secured creditor's interest in the cash
3 collateral.

4      Because the Lenders assert a lien on the Cash Collateral, as
5 adequate protection for the use of such Cash Collateral, the
6 Trustee proposes to (a) grant the Lenders effective immediately
7 and without the necessity of the execution by the Trustee of any
8 financing statement or other documentation, in accordance with
9 section 361(2) of the Bankruptcy Code, a valid, perfected,
10 enforceable and non-avoidable replacement lien on its existing
11 collateral and the proceeds thereof, including cash flow generated
12 from post-petition collections ("Postpetition Collateral"), but
13 only if and to the extent that the Lenders' prepetition security
14 interests are valid, enforceable, properly perfected and
15 unavoidable. Any replacement lien would exclude causes of action
16 arising under section 105, 506(c), 542, 543, 544, 545, 546, 547,
17 548, 549, 550, 551, 552 and 553 of the Bankruptcy Code. Granting
18 the Lenders a replacement lien in the Postpetition Collateral to
19 the extent of any diminution in value of the Lenders' Existing
20 Collateral adequately protects the Lender's position by giving
21 them an ongoing interest in postpetition cash generated from its
22 Existing Collateral.

23 **C.**    **The Preservation and Enhancement of the Collateral Resulting**
24        **from the Trustee's Actions Affords Further Adequate**
25        **Protection to the Lenders.**

26      Allowing the Trustee to use Cash Collateral and Post-Petition
27 Financing to finance the Trustee's preservation and liquidation
28 efforts will preserve and enhance the Lenders' Existing

1   Collateral. The Trustee's ability to maximize the value of the

2   assets is inextricably tied to protecting the assets as well as

3   maintaining the going concern value of the business, which in turn

4   is dependent on having cash available to pay for expenses such as

5   preservation of the existing equipment, through payment of

6   utilities and other necessary expenses.

7          The Trustee should be authorized to use the cash collateral

8   and Post-Petition Financing to preserve the assets of the Debtors

9   and pay the operating expenses within the limits of the proposed

10  Interim Budget through June 10, 2011.  The use of the cash

11  collateral is in the best interests of the estate and the

12  creditors.  The Trustee has an ongoing need to maintain the assets

13  pending the sale of the same for the benefit of the estate and its

14  creditors.  Absent the use of the cash collateral, the Trustee

15  will be unable to pay rent, utilities and other expenses necessary

16  to liquidate the assets and generate a return for unsecured

17  creditors.

18  **D.    Post-Petition Financing Secured by Replacement Liens and**

19  **Superpriority Administrative Expense Claims is Appropriate.**

20         Section 364 of the Code provides that if a trustee is unable

21  to obtain unsecured credit allowable under § 503(b)(1) of the Code

22  as an administrative expense,

23              the court, after notice and a hearing, may
                authorize the obtaining of credit or the
24              incurring of debt –
                (1) with priority over any or all
25              administrative expenses of the kind specified
                in section 503(b) or 507(b) of this title;
26              (2) secured by a lien on property of the
                estate that is not otherwise subject to a
27              lien; or
                (3) secured by a junior lien on property of
28              the estate that is subject to a lien.

                              30

1    11 U.S.C. § 364(c).   Section 364 further provides:

2              The court, after notice and a hearing, may
               authorize the obtaining of credit or the
3              incurring of debt secured by a senior or equal
               lien on property of the estate that is subject
4              to a lien only if –
               (A) the trustee is unable to obtain such
5              credit otherwise; and
               (B) there is adequate protection of the
6              interest of the holder of the lien on the
               property of the estate on which such senior or
7              equal lien is proposed to be granted.

8        11 U.S.C. § 364(d).

9        Section 363(e) provides that, on request of an entity that

10   has an interest in property used, sold or leased, or proposed to

11   be used, sold or leased by the trustee, the court must prohibit or

12   condition the use, sale or lease as is necessary to provide

13   adequate protection of such interest.   Here, collateral securing

14   Lenders' prepetition liens (particularly, accounts receivable and

15   funds generated from liquidation of assets) will be used by the

16   Trustee to repay Lenders on account of their postpetition

17   financing.   Accordingly, the value of Lenders' prepetition

18   collateral may diminish in value.   To compensate Lenders (in their

19   capacity as prepetition lender) for the reduction in value of its

20   interest in collateral, the Trustee has agreed to provide Lenders

21   adequate protection in the form of replacement liens against all

22   of their pre-petition collateral.   The extension of adequate

23   protection in such forms is appropriate under the circumstances of

24   this case and the Code, see 11 U.S.C. § 361, and should be

25   approved.

26

27

28

31

# VI.

## DISCLOSURES MADE PURSUANT TO FEDERAL RULE OF

## BANKRUPTCY PROCEDURE 4001(c)(1)(B) AND LOCAL

## BANKRUPTCY RULE 4001-2

Pursuant to Federal Rule of Bankruptcy Procedure 4001(c)(1)(B) and Local Bankruptcy Rule 4001-2, the following information is provided concerning the Trustee's proposed financing agreement:[3]

| Description of Provision | Y/N |
|---|---|
| Grant of priority or a lien on property of the estate under § 364(c) or (d) | Y |
| Cross-collateralization clauses | N |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the validity, perfection or amount of the secured party's lien or debt | N/A |
| Provisions or findings of fact that bind the estate or all parties in interest with respect to the relative priorities of the secured party's lien and liens held by persons who are not party to the stipulation, or which create a lien senior or equal to any existing lien | N/A |
| Waiver or modification of the applicability of nonbankruptcy law relating to the perfection of a lien on property of the estate, or on the foreclosure or other enforcement of the lien | N |

---

[3] Where Federal Rule of Bankruptcy Procedure 4001(c)(1)(B) substantially overlaps with Local Bankruptcy Rule 4001-2, the disclosures have been joined.

369911.01 [XP] 1130496A

| Description of Provision | Y/N |
| --- | --- |
| Determination of the validity, enforceability, priority or amount of a claim that arose before the commencement of the case, or of any lien securing the claim | N |
| Waivers of 11 U.S.C. § 506(c), unless the waiver is effective only during the period in which the debtor is authorized to use cash collateral or borrow funds | N |
| Provisions that operate, as a practical matter, to divest the debtor in possession of any discretion in the formulation of a plan or administration of the estate or to limit access to the court to seek any relief under applicable provision of law | N/A |
| Establishment of deadlines for filing a plan of reorganization, for approval of a disclosure statement, for a hearing on confirmation, or for entry of a confirmation order | N/A |
| Releases of liability for the creditor's alleged prepetition torts or breaches of contract | N/A |
| Waivers of avoidance actions arising under the Bankruptcy Code | N |
| Release, waiver, or limitation on any claim or other cause of action belonging to the estate or the trustee, including any modification of the statute of limitations or other deadline to commence an action | N |
| Automatic relief from the automatic stay upon default, conversion to chapter 7, or appointment of a trustee | N |
| Waiver or modification of Code provisions or applicable rules relating to the automatic stay | N |

33

369911.01 [XP] 1130496A

| Description of Provision | Y/N |
|---|---|
| Waivers of procedural requirements, including those for foreclosure mandated under applicable non-bankruptcy law, and for perfection of replacement liens | Y |
| Adequate protection provisions which create liens on claims for relief arising under 11 U.S.C. §§ 506(c), 544, 545, 547, 548, 549, 553(b), 723(a) or 724(a) | N |
| Waivers of the debtor's right to move for a court order pursuant to 11 U.S.C. § 363(c)(2)(B) authorizing the use of cash collateral in the absence of the secured party's consent | N |
| Waiver or modification of the Trustee's right to request authority to obtain credit under § 364 | N |
| Provisions that grant a lien in an amount in excess of the dollar amount of cash collateral authorized under the applicable cash collateral order | N |
| Provisions providing for the paying down of prepetition principal owed to a creditor | N |
| Indemnification of any entity | N |
| Findings of fact on matters extraneous to the approval process | N |

## VII.

### REQUEST FOR FINAL HEARING ON THE WITHIN MOTION

Pursuant to, among other things, Federal Rule of Bankruptcy Procedure 4001(b)(2) and c)(2), the Trustee is requesting that the Court approve his proposed use of cash collateral and Post-petition Financing, on the terms set forth in the Proposed Order, on an interim basis. In addition, the Trustee is requesting that the Court set a hearing on final approval of the proposed

34

1 | financing on a date and time convenient to the Court that is no
2 | less than fifteen calendar days from the date of the hearing on
3 | the within motion.

4 |     The Trustee requires and requests the use of cash collateral
5 | and Post-Petition Financing pursuant to the Interim Budget and as
6 | it may be modified with approval of this court.  Except as to such
7 | amounts as the Lenders permits the Trustee to utilize as general
8 | funds, all cash collateral will handled as required by law and the
9 | rules of this Court.

10 | **VIII.**

11 | <u>**THE TRUSTEE SHOULD BE AUTHORIZED TO PAY POSTPETITION WAGES EARNED**</u>
12 | <u>**BY EMPLOYEES NECESSARY TO THE PRESERVATION AND LIQUIDATION OF THE**</u>
13 | <u>**DEBTORS' ASSETS**</u>

14 |     Pursuant to §§ 363(b) and 105(a) of the Code and the
15 | "necessity of payment" doctrine, the Trustee requests authority to
16 | pay wages to those of the Debtors' employees who are necessary for
17 | the Trustee's efforts in preserving and liquidating the Debtors'
18 | assets. Section 363(b) of the Code provides that a trustee "may
19 | use, sell, or lease, other than in the ordinary course of
20 | business, property of the estate."  11 U.S.C. § 363(b)(1).
21 | Further, § 105(a) provides, in pertinent part, that the "court may
22 | issue any order, process, or judgment that is necessary or
23 | appropriate to carry out the provisions of" the Code.  11 U.S.C. §
24 | 105(a).  The purpose of § 105(a) is "to enable the court to do
25 | whatever is necessary to aid in its jurisdiction, in anything
26 | arising in or relating to a bankruptcy case."  2 Collier on
27 | Bankruptcy ¶ 105.02 at 105-4 (15th ed. Rev. 2011).  Essentially, §
28 |

35