# EXHIBIT A

Bill of Sale

This **BILL OF SALE** (this "**Bill of Sale**") is made and delivered this 21st day of June, 2011, by **David A. Gill**, solely in his fiduciary capacity as Chapter 7 Trustee ("**Seller**") for the estates of International Architectural Group, LLC, International Architectural Products, Inc., International Management Services Group, Inc. and United States Aluminum of Canada Limited (collectively, the "**Debtors**"), for the benefit of **Universal Molding Company Inc. ("Buyer")**.

WHEREAS, Buyer participated in a public auction sale of the assets of the Debtors and was declared the successful bidder, the terms of which are incorporated herein by reference, which provides, among other things, for the sale and assignment by Seller to Buyer of the assets of the Debtors.

NOW, THEREFORE, in consideration of the purchase price of $8,000,000 (Eight Million Dollars) tendered by the Buyer and received by the Seller, which purchase price Buyer agrees to pay to Seller one (1) business day after entry of the Sale Order (defined below) by the Bankruptcy Court for the Central District of California (the "**Bankruptcy Court**"), the mutual promises made by and between Buyer and Seller and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged:

1. Seller, on behalf of the Debtors and their estates, hereby irrevocably sells, grants, assigns, transfers, conveys and delivers unto Buyer, and its successors and assigns, forever, all of the Debtors' right, title and interest in and to the purchased assets ("**Purchased Assets**"), described in greater detail on Exhibit 1 attached hereto and incorporated herein by this reference, free and clear of any and all Liens, **TO HAVE AND TO HOLD** such Purchased Assets with all rights and appurtenances thereto, unto Buyer, and its successors and assigns, for their use forever. Buyer hereby accepts the foregoing sale, grant, assignment, transfer, conveyance and delivery of the Purchased Assets. For ease of reference and to avoid any doubt about the Purchased Assets, a list of excluded assets ("**Excluded Assets**") is described in greater detail on Exhibit 2 attached hereto and incorporated herein by this reference.

2. This Bill of Sale shall inure to the benefit of and be binding upon the parties hereto and their respective successors and assigns.

3. This Bill of Sale is executed and delivered pursuant to (i) the Order (A) Approving Procedures For Sale of Estate Property; (B) Approving the Terms of Employment of the Auctioneer/Sales Agent; (C) Scheduling an Auction for the Sale; (D) Authorizing the Sale Free and Clear of Liens, Claims, Encumbrances and Interests Without Further Hearing, and (E) Granting Related Relief entered by the Bankruptcy Court on June 15, 2011 (the "**Bidding Procedures Order**"); and (ii) an Order of the Bankruptcy Court approving the sale of the Purchased Assets to Buyer (the "**Sale Order**"), which Sale Order shall be in form and substance satisfactory to Buyer and Seller. In the event of any dispute between Buyer and Seller with respect to the Sale

Order, the Bankruptcy Court shall resolve the dispute and the Buyer and Seller agree to be bound by the decision of the Bankruptcy Court with respect to such dispute. Nothing in this Bill of Sale, express or implied, is intended to or shall be construed to modify, expand or limit in any way the terms of the Sale Order. To the extent that any provision of this Bill of Sale conflicts or is inconsistent with the terms of the Sale Order or the Bidding Procedures Order, the Sale Order and Bidding Procedures Order shall govern. A Sale Order will be finalized after the auction subject to the terms and conditions herein.

4.  Additional terms of this sale, including (i) requirements for the removal of Purchased Assets from certain facilities; (ii) requirements relating to the purchase of the Debtors' real estate located in Waxahachie, Texas; (iii) transfer taxes; and (iv) the absence of representations are described in greater detail on Exhibit 3 attached hereto and incorporated herein by this reference.

5.  At any time or from time to time, at Buyer's reasonable request and cost and without further consideration, Seller shall execute and deliver to Buyer such other instruments of sale, transfer, conveyance, assignment and confirmation, provide such materials and information and take such other actions as Buyer may reasonably deem necessary or desirable in order more effectively to transfer, convey and assign the Purchased Assets to Buyer.

6.  This Bill of Sale, and all claims and causes of action (whether in contract or in tort) that may be based upon, arise out of or relate to this Bill of Sale, or the execution or performance of this Bill of Sale, shall be governed by and construed in accordance with the laws of the State of New York applicable to contracts made and performed in such State without giving effect to the choice of law principles of such State or any other jurisdiction that would require or permit the application of the substantive laws of any jurisdiction other than New York.

7.  (a) The Bankruptcy Court shall retain exclusive jurisdiction to enforce the terms of this Bill of Sale and to decide any claims or disputes which may arise or result from, or be connected with, this Bill of Sale, and any and all proceedings related to the foregoing shall be filed and maintained only in the Bankruptcy Court, and the parties hereto (the "**Parties**") hereby consent to and submit to the jurisdiction and venue of the Bankruptcy Court; provided, however, that if the Debtors' bankruptcy cases have been fully and finally dismissed and the Bankruptcy Court declines jurisdiction, the Parties agree to and hereby unconditionally and irrevocably submit to the exclusive jurisdiction of the United States District Court for the Southern District of New York sitting in New York County and any appellate court from any thereof, for the resolution of any such claim or dispute; and (b) the Parties hereby unconditionally and irrevocably waive, to the fullest extent permitted by applicable law, any objection which they may now or hereafter have to the laying of venue of any dispute arising out of or relating to this Bill of Sale brought in any court specified in subsection (a) above, or any defense of inconvenient forum for the maintenance of such dispute. Each of the Parties agrees that a

EXHIBIT A   0011

judgment in any such dispute may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by applicable law.

8. This Bill of Sale may be executed in two or more counterparts (including via facsimile), each of which will be deemed to be an original copy of this Bill of Sale and all of which, when taken together, will be deemed to constitute one and the same instrument.

**ACCEPTED AND AGREED AS TO FORM AND CONTENT:**

BUYER

Universal Molding Company Inc.

By: _____
Name:
Title:

SELLER

David A. Gill, as Chapter 7 Trustee for estates of Debtors International Architectural Group, LLC, International Architectural Products, Inc., International Management Services Group, Inc. and United States Aluminum of Canada Limited

By: _____
Name: David A. Gill
Title: Chapter 7 Trustee

# EXHIBIT 1
## 'PURCHASED ASSETS"

All of the Debtors' right, title and interest in, to and under substantially all of Debtors' assets, but excluding the Excluded Assets.

EXHIBIT A    0013

# EXHIBIT 2
## "EXCLUDED ASSETS"

Excluded Assets shall include:

(i) all cash, cash equivalents whatsoever, whether on hand, in banks or elsewhere, and all deposits or similar cash items of the Debtors, including, but not limited to, all deposit accounts and securities accounts and any funds, securities or other items maintained therein;

(ii) all accounts, accounts receivable, contract rights to payment, notes or notes receivable owing from affiliated companies;

(iii) all of Debtors' deposits, retainers or prepaid charges and expenses paid in connection with, or relating to, any Excluded Assets or the Bankruptcy Cases;

(iv) any claim, right or interest of Seller, on behalf of the Debtors and their estates, in or to any refund, rebate, benefit, abatement or other recovery for taxes, together with any interest due thereon or penalty rebate arising therefrom, relating to, or arising out of, the Debtors' ownership of the Purchased Assets or operation of the Debtors' business prior to the closing, and any U.S. and Canadian tax net operating losses of the Debtors;

(v) all supplier rebates and credits, and insurance refunds, policies or proceeds;

(vi) any rights, claims or causes of action of Seller, on behalf of the Debtors and their estates, against any parties relating to the assets, properties, business or operations of the Debtors arising out of events occurring on or prior to the closing, excluding warranty claims and rights against the manufacturers of any of the Purchased Assets and warranty claims against suppliers which relate to claims brought against Buyer after the closing;

(vii) any rights, claims or causes of action of Seller, on behalf of the Debtors and their estates, pending or otherwise, against any parties, including, without limitation, any rights, claims or causes of action relating to, or arising out of, this Bill of Sale or the Sale Order, sections 544 through 553 of the Bankruptcy Code, or applicable state and federal law;

(viii) (1) any documents primarily related to any Excluded Assets; (2) files which Seller is not permitted to release to Buyer under applicable laws regarding privacy or pursuant to any contractual confidentiality obligation owed to any third party; (3) personnel files, including medical records, pertaining to any

employee; (4) other books and records that Seller is required by law to retain or that Seller determines are necessary or advisable to retain including, without limitation, tax returns, financial statements, and corporate or other entity filings, including incorporation documents, corporate minutes, financial records, legal records and any other documentation necessary for the estates of the Debtors);

(ix)    any permits which are not assignable, notwithstanding the provisions of section 365 of the Bankruptcy Code; and

(x)    any and all leases, any and all leased real or personal property and any owned real property, except for the Debtors' owned real property located in Waxahachie, Texas.

EXHIBIT A    0015

# EXHIBIT 3
## "ADDITIONAL TERMS OF SALE"

### 1.1 Removal of Purchased Assets

In accordance with the Bidding Procedures Order, Buyer shall promptly, and in any event no later than thirty (30) days following the closing date (the "**Asset Removal Deadline**"), remove the Purchased Assets from any real property constituting Excluded Assets. In the event that Buyer has not removed all of the Purchased Assets from such real property by the Asset Removal Deadline, then Buyer shall be solely responsible for any and all fees, costs, expenses, liabilities and damages (including, without limitation, any costs and expenses attributable to rent and related expenses for the period of time following the Asset Removal Deadline (regardless of when payment of such rent or related expenses is due pursuant to any applicable lease) and any fees, expenses, liabilities and damages (including, without limitation, any special, consequential, punitive, incidental or indirect damages or losses)) of the Seller, Debtors, and/or Secured Parties (defined below) arising out of, or related to, Buyer's failure to remove the Purchased Assets from all of such real property. In connection with the removal of the Purchased Assets, Buyer shall be solely responsible for leaving each site in "broom clean" condition. In the event Buyer fails to leave each site in "broom clean" condition, Buyer shall be responsible for any losses, damages, and liabilities incurred by Seller with respect to the failure to leave each site in such condition. Any requests for extension of the Asset Removal Deadline in respect of any parcel of such real property must be tendered directly to the applicable landlord(s) and any and all expenses of the Seller, Debtors, and/or Secured Parties resulting from such extension shall be borne by Buyer and is subject to the consent of Seller and the administrative agent (the "**Administrative Agent**") under that certain credit agreement dated May 21, 2010 (as may be amended, restated, modified or supplemented from time to time, the "**Credit Agreement**") among International Architectural Products, Inc., as Borrower, International Architectural Group LLC, as Holdings, and the lenders from time to time parties thereto (together with the Administrative Agent, the "**Secured Parties**").

### 1.2 Removal of Information

Buyer shall cooperate with the Seller in the elimination, removal, deletion, erasure, or expungement of all proprietary, confidential, and/or private information, files, documents, and materials, including Excluded Documents, as specified by the Seller in its discretion (collectively, the "**Removed Information**"), from the Purchased Assets, wherever located in or with respect to the Purchased Assets, and in whatever form, including physical, electronic or otherwise. The Removed Information shall be eliminated, removed, deleted, erased, or otherwise expunged from the Purchased Assets by no later than the Asset Removal Deadline. Buyer shall be solely responsible for any and all fees, costs and expenses associated with the elimination, removal, deletion, erasure, or expungement of the Removed Information, including and any fees and

expenses of the Seller, Debtors, and/or secured parties incurred in connection with such Purchased Asset following the Closing.

### 1.3 Transfer Taxes

Buyer shall be responsible for (and shall indemnify and hold harmless Seller, the Debtors and their estates, and their directors, officers, employees, affiliates, agents, successors and permitted assigns against) any sales, use, stamp, documentary stamp, filing, recording, transfer, real property transfer, conveyance, registration or similar fees or taxes or governmental charges (including any interest and penalty thereon) payable in connection with the transactions contemplated hereby ("**Transfer Taxes**"). To the extent that any Transfer Taxes are required to be paid by Seller, on behalf of the Debtors and their estates (or such Transfer Taxes are assessed against the Debtors), Buyer shall promptly reimburse Seller, on behalf of the Debtors and their estates, as applicable, for such Transfer Taxes. Buyer will, at its own expense, file all necessary tax returns and other documentation with respect to all Transfer Taxes and fees, and, if required by applicable law, Seller will join in the execution of any such tax returns and other documentation. Seller and Buyer shall cooperate and otherwise take commercially reasonable efforts to obtain any available refunds for Transfer Taxes.

### 1.4    Waxahachie Property

With respect to the Debtors' owned real estate located in Waxahachie, Texas (the "**Waxahachie Property**"), nothing in this Bill of Sale or the Sale Order shall be deemed to (i) release or nullify any liability to any governmental body under statutes or regulations to which Buyer or any assignee would be subject as the owner or operator of the Waxahachie Property after the closing, as if the sale had taken place without the approval of the Bankruptcy Court, (ii) modify Buyer's obligations after the closing to comply with applicable regulations, statutes, or agency directives concerning the Waxahachie Property, or (iii) impair or restrict any such governmental body's ability to pursue all of its rights and remedies in state court against Buyer after the closing. Nothing in this Bill of Sale releases, nullifies, or enjoins the enforcement of any liability of Buyer to a governmental body in respect of the Waxahachie Property under police and regulatory statutes or regulations that the Buyer would be subject to as the owner or operator of the Purchased Assets after the closing, and Buyer reserves all rights and defenses other than asserting that it is free of such liability on account of this Bill of Sale or the Sale Order with respect to any liability to a governmental body under police and regulatory statutes or regulations the extent that it fails to preserve Buyer's obligations to comply with applicable law as the post-acquisition operator of contaminated or defective property or equipment.

EXHIBIT A    0017

### 1.5 Independent Investigation, No Representations or Warranties

Buyer acknowledges and agrees that none of the Seller, the Debtors, nor any other person is making any representations or warranties whatsoever, express or implied, and Buyer acknowledges and agrees that the Purchased Assets are being transferred on a "where is" and, as to condition, "as is" basis, "with all faults." Buyer acknowledges that it has read the Bidding Procedures Order, including the "as is where is" clause therein, and the Buyer acknowledges and agrees that the bidding procedures, including the "as is where is" clause therein, shall be binding on the Buyer. Buyer further represents that neither Seller, the Debtors, nor any of their affiliates nor any other person has made any representation or warranty, express or implied, as to the accuracy or completeness of any information regarding the Purchased Assets, the Debtors' businesses or the transactions contemplated hereby not expressly set forth in this Bill of Sale, and none of Seller, the Debtors and their estates, the Sales Agent or any of their affiliates or representatives, or any Secured Party, will have or be subject to any liability to Buyer or any other person resulting from the distribution to Buyer or its representatives or buyer's use of, any such information, including any confidential memoranda distributed on behalf of the Debtors relating to the Debtors' business or other publications or data room information provided to Buyer or its any of its affiliates or representatives, or any other document or information in any form provided to Buyer or any of its affiliates or representatives in connection with the sale of the Purchased Assets and the transactions contemplated hereby. Buyer acknowledges that it has conducted to its satisfaction its own independent investigation of the Debtors' business and the Purchased Assets, and in making the determination to proceed with the transactions contemplated hereby, Buyer has relied on the results of its own independent investigation.

EXHIBIT A    0018

**EXHIBIT B**

Description of a 55.2230 acre tract of land situated in the Joseph Berson Survey, Abstract No. 104 and the N. P. Neal Survey, Abstract No. 1320, City of Waxahachie, Texas and being all of Lot 1, Block A, International Aluminum Corporation, an addition to the City of Waxahachie, Ellis County, Texas according to the plat thereof as recorded in Cabinet C, Page 429, Plat Records, Ellis County, Texas; said 55.2230 acre tract being more particularly described by metes and bounds as follows;

BEGINNING, at a 1/2-inch iron rod found at the northeast corner of said Lot 1, Block A; said point also being the southeast corner of a tract of land conveyed to Owens-Corning Fiberglass by Warranty Deed as recorded in Volume 2279, Page 267, Deed Records, Ellis County, Texas; said point also being on the west right-of-way line of M. K. and T. Railroad (100 feet wide);

THENCE, South 17 degrees 12 minutes 29 seconds West, with the common line of said Lot 1, Block A and M. K. and T. Railroad, a distance of 1211.13 feet to a 1/2-inch iron rod found at the southeast corner of said Lot 1, Block A; said point also being the northeast corner of Lot 1, Block A, Waxahachie Business Industrial Park, an addition to the City of Waxahachie, Ellis County, Texas according to the plat thereof as recorded in Cabinet A, Page 626, Plat Records, Ellis County, Texas;

THENCE, North 72 degrees 49 minutes 00 seconds West, leaving the said west right-of-way line and with the south line of said Lot 1, Block A, International Aluminum Corporation, a distance of 399.78 feet to a 1/2-inch iron rod found on the east right-of-way line of Singleton Drive (60 feet wide); said point also being the beginning of a circular curve to the right having a radius of 50.00 feet;

THENCE, northwesterly, with said circular curve to the right through a central angle of 286 degrees 53 minutes 04 seconds, an arc length of 250.35 feet (chord bears North 72 degrees 49 minutes 00 seconds West, 59.56 feet) to a point in the west right-of-way of said Singleton Drive;

THENCE, South 17 degrees 13 minutes 33 seconds West, continuing with said west right-of-way line, a distance of 288.38 feet to a point for corner; said point also being the northeast corner of Lot 2, Block B, Waxahachie Business Industrial Park, an addition to the City of Waxahachie, Ellis County, Texas;

THENCE, North 72 degrees 44 minutes 56 seconds West, leaving said west right-of-way line, a distance of 356.04 feet to a 5/8-inch iron rod found for corner; said point also being the northwest corner of said Lot 2, Block B;

THENCE, South 17 degrees 15 minutes 04 seconds West, a distance of 329.83 feet to a 3/8-inch iron rod found at the south corner of said Lot 1, Block A; said point also being on the northeast right-of-way line of Solon Road (60 feet wide);

THENCE, North 30 degrees 03 minutes 07 seconds West, with the said northeast

right-of-way line, a distance of 1658.27 feet to a point for corner;

THENCE, North 61 degrees 38 minutes 10 seconds East, a distance of 9.77 feet to a point at the south end of a corner clip at the intersection of said northeast right-of-way line of Solon Road and the southeast right-of-way line of Interstate Highway 35E (variable width right-of-way);

THENCE, North 03 degrees 11 minutes 09 seconds West, with said corner clip, a distance of 133.37 feet to a 1/2-inch iron rod found at the north end of said corner clip;

THENCE, North 34 degrees 31 minutes 40 seconds East, with said southeast right-of-way line; a distance of 329.31 feet to a 1/2-inch iron rod found at the northwest corner of said Lot 1, Block A; said point also being the southwest corner of said Owens-Corning Fiberglass tract;

THENCE, with the common line of said Lot 1, Block A and Owens-Corning Fiberglass tract the following metes and bounds;

South 80 degrees 12 minutes 15 seconds East, a distance of 1170.58 feet to a 3/4-inch iron rod found for an angle point;

South 80 degrees 14 minutes 27 seconds East, a distance of 821.36 feet to the POINT OF BEGINNING;

CONTAINING, 2,405,514 square feet or 55.2230 acres of land, more or less.